REDACTED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| MANNY'S AUTO SUPPLY, INC. and IRVING LEVINE AUTOMOTIVE DISTRIBUTORS, INC., on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>BOYSEN USA, LLC,<br><br>        Defendant. | Case No. 18-cv-13688 |

## CLASS ACTION COMPLAINT

Plaintiffs Manny's Auto Supply, Inc. and Irving Levine Automotive Distributors, Inc., individually and on behalf of a proposed class of direct purchasers of Automotive Exhaust Systems, bring this class action against Defendant under the federal antitrust laws for treble damages and allege as follows.

## NATURE OF THE CASE

1.      Beginning at least as early as January 1, 2002, the Defendant and its co-conspirators—United States and global manufacturers and suppliers of Automotive Exhaust Systems —violated the antitrust laws by entering into a continuing conspiracy to rig bids and fix, raise, maintain, or stabilize prices of Automotive Exhaust Systems sold in the United States and elsewhere at supra-competitive levels. As a result of this unlawful conduct, Plaintiffs and other Class members paid artificially inflated prices for Automotive Exhaust Systems and have suffered antitrust injury to their business or property.

REDACTED

2.     On March 25, 2014, European Commission antitrust regulators raided the offices of several Automotive Exhaust Systems makers, including some of the co-conspirators in this case, as part of their investigation into possible collusion between manufacturers of exhaust systems. One of the co-conspirators in this case has received a subpoena from the U.S. Department of Justice.

3.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "Sherman Act") and Section 4 of the Clayton Act, 15 U.S.C. § 15 (the "Clayton Act"), and assert the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiffs, which are based upon personal knowledge. Plaintiffs' information and belief are based upon, *inter alia*, the investigation made by their attorneys.

## DEFINITIONS

4.     "Automotive Exhaust Systems" are defined as one or more of the following: manifolds, flex pipes, catalytic converters, converters, diesel oxidation catalysts, diesel particulate filters, oxygen sensors, isolators, gaskets, clamps, resonator assemblies, pipe accessories, mufflers, muffler assemblies, and tubes. An exhaust system has a "hot end," which is the part of the exhaust system that is mounted to the engine (generally comprising the manifold and/or catalytic converter) and a "cold end," which is the part of the exhaust system that is mounted to the underbody of the car (and contains, for example, the muffler, pipes and/or the catalytic converter).

5.     The "Class Period" is from at least as early as January 1, 2002 to the date of the filing of this Complaint.

REDACTED

## JURISDICTION AND VENUE

6.     Plaintiffs bring this action to recover treble damages, costs of suit, and reasonable attorneys' fees resulting from Defendant's and its co-conspirators' violations of the Sherman Act, 15 U.S.C. § 1.

7.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

8.     Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and the Defendant resides in, is licensed to do business in, is doing business in, had agents in, is found in, or transacts business in this District.

9.     The activities of Defendant and its co-conspirators were within the flow of and were intended to and did have a substantial effect on, the interstate commerce of the United States.

10.     This Court has *in personam* jurisdiction over the Defendant because, *inter alia,* Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Automotive Exhaust Systems throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

REDACTED

## THE PARTIES

*Plaintiffs*

11.     Plaintiff Manny's Auto Supply, Inc. ("Manny's Auto Supply") is a Connecticut corporation with its principal place of business in Connecticut. Manny's Auto Supply purchased Automotive Exhaust Systems directly from the Defendant or its co-conspirators during the Class Period.

12.     Plaintiff Irving Levine Automotive Distributors, Inc. ("Irving Levine") is a Connecticut corporation with its principal place of business in Danbury, Connecticut. Irving Levine purchased Automotive Exhaust Systems directly from the Defendant or its co-conspirators during the Class Period.

*Defendant*

13.     Defendant Boysen USA, LLC ("Boysen USA"), a Delaware limited liability company, is a manufacturer of Automotive Exhaust Systems with its principal place of business in Gaffney, South Carolina. Upon information and belief, Boysen USA also does business as Boysen USA Gaffney, LLC. Boysen USA—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

## DEFENDANT'S CO-CONSPIRATORS

*Boysen GmbH*

14.     Friedrich Boysen GmbH & Co. KG (hereinafter, "Boysen GmbH") is a company with its principal place of business in Germany. Boysen GmbH—directly or through its subsidiaries, including Defendant Boysen USA, which Boysen GmbH wholly owned or controlled — sold Automotive Exhaust Systems that were purchased in the United States,

REDACTED

including in this District, during the Class Period. Boysen GMBH manufactures and exports components for Automotive Exhaust Systems to its subsidiaries in the United States, including the Defendant, for assembly and sale to customers in the United States. Boysen GmbH, along with Defendant Boysen USA, are referred to collectively in this Complaint as "Boysen."

*Tenneco*

15.     Tenneco, Inc., is a Delaware corporation and manufacturer of Automotive Exhaust Systems with its principal place of business in Illinois. Tenneco, Inc.—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

16.     Tenneco Automotive Operating Co., Inc., is a Delaware corporation and manufacturer of Automotive Exhaust Systems with its principal place of business in Illinois. It is a subsidiary of and wholly owned and/or controlled by its parent, Tenneco, Inc. Tenneco Automotive Operating Co., Inc., sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

17.     Tenneco GmbH is a German company and manufacturer of Automotive Exhaust Systems with its principal place of business in Germany. Tenneco GmbH is a subsidiary of and wholly owned and/or controlled by its parent, Tenneco, Inc. Tenneco GmbH sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period. Tenneco, Inc., Tenneco Automotive Operating Co., Inc., and Tenneco GmbH are referred to collectively in this Complaint as "Tenneco."

REDACTED

*Bosal*

18.    Bosal Nederland, B.V. is a Dutch company with its principal place of business in the Netherlands. Bosal Nederland, B.V.—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems during the Class Period.

19.    Bosal Industries-Georgia, Inc. is a manufacturer of Automotive Exhaust Systems with its principal place of business in Michigan. Bosal Industries-Georgia, Inc. operates under the assumed name Bosal International North America and is the North American headquarters of Bosal Nederland, B.V. Bosal Industries-Georgia is a subsidiary of and wholly owned by its parent, Bosal Nederland, B.V. Bosal Industries-Georgia, Inc. sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

20.    Bosal USA, Inc. is a manufacturer of Automotive Exhaust Systems with its principal place of business in New Jersey. Bosal USA, Inc. is a subsidiary of and wholly owned by its parents, Bosal Nederland, B.V. and/or Bosal Industries Georgia, Inc. Bosal USA, Inc. sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period. Bosal Nederland, B.V., Bosal Industries-Georgia, Inc. and Bosal USA, Inc. are referred to collectively in this Complaint as "Bosal."

*Eberspacher*

21.    Eberspacher Exhaust Technology GmbH & Co. KG is a company with its principal place of business in Germany. Eberspacher Exhaust Technology GmbH & Co. KG—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

REDACTED

22.     Eberspacher North America, Inc. is a manufacturer of Automotive Exhaust Systems with its principal place of business in the Eastern District of Michigan. Eberspacher North America, Inc.—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period. Eberspacher Exhaust Technology GmbH & Co. KG and Eberspacher North America, Inc. are referred to collectively in this Complaint as "Eberspacher."

*Faurecia*

23.     Faurecia SA is a French company with its principal place of business in France. Faurecia SA—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

24.     Faurecia Emissions Control Technologies, USA, LLC ("Faurecia Emissions Control") is a manufacturer of Automotive Exhaust Systems with its principal place of business in Indiana. Faurecia Emissions Control is a subsidiary of and wholly owned and/or controlled by Faurecia SA. In 2004 EMCON Technologies, LLC ("EMCON") acquired the Exhaust Systems Business of ArvinMeritor, Inc. In 2009, Faurecia, SA acquired EMCON, and EMCON became Faurecia Emissions Control. Faurecia Emissions Control—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

25.     Faurecia Exhaust Systems, Inc. is a manufacturer of Automotive Exhaust Systems with its principal place of business in Ohio. Faurecia Exhaust Systems, Inc. sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

7

REDACTED

26.     Faurecia SA, Faurecia Emissions Control Technologies, USA, LLC and Faurecia Exhaust Systems, Inc. are referred to collectively in this Complaint as "Faurecia."

*Meritor*

27.     Meritor, Inc. f/k/a ArvinMeritor (hereinafter, "Meritor"), is an Indiana company with its headquarters in Troy, Michigan. In 2004, EMCON acquired the Exhaust Systems business of ArvinMeritor, Inc. Upon information and belief, ArvinMeritor, Inc. (currently known as Meritor, Inc.) retained some or all of the liabilities of the Exhaust Systems business sold to EMCON. Meritor, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—sold Exhaust Systems that were purchased throughout the United States, including in this District, during the Class Period.

28.     The acts alleged in this Complaint to have been done by the Defendant and its co-conspirators were authorized, ordered, and condoned by their respective parent companies. The acts alleged to have been done by the Defendant and its co-conspirators were authorized, ordered, and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

29.     Bosal, Boysen GmbH, Eberspacher, Faurecia, Meritor, and Tenneco, (collectively, the "Co-Conspirators") have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. The Defendant is jointly and severally liable for the acts of the Co-Conspirators whether named or not named as defendants in this Complaint.

30.     Defendant and each Co-Conspirator acted as a principal or an agent of or for the other Co-Conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

8

REDACTED

## INTERSTATE TRADE AND COMMERCE

31.    The activities of Defendant and the Co-Conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

32.    During the Class Period, Defendant and the Co-Conspirators manufactured, sold, and shipped substantial quantities of Automotive Exhaust Systems in a continuous and uninterrupted flow of interstate and foreign commerce.

## AUTOMOTIVE EXHAUST SYSTEMS

33.    Automotive Exhaust Systems manufactured, distributed or sold by Defendant and the Co-Conspirators during the Class Period are not functionally distinguishable from each other in any material respect.

34.    Automotive Exhaust Systems are installed by motor vehicle original equipment manufacturers ("OEMs") in new motor vehicles as part of the manufacturing process. They are also installed in motor vehicles to replace worn out, defective, or damaged Automotive Exhaust Systems.

35.    OEMs include the Big Three in Detroit (General Motors, Ford, and Fiat Chrysler) and non-domestic companies that also operate manufacturing plants in the United States. For example, during the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz in Alabama, and Kia in Georgia. In addition to OEMs, distributors, such as Plaintiffs, and others, purchased Automotive Exhaust Systems directly from Defendant and the Co-Conspirators.

36.    When purchasing Automotive Exhaust Systems, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers. For automotive OEMs, the bidding process

REDACTED

begins approximately three years prior to the start of production of a new model platform. In response, motor vehicle parts suppliers submit quotations or bids and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years. Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and the United States.

37.     Defendant and the Co-Conspirators supplied Automotive Exhaust Systems to OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere. Defendant and the Co-Conspirators manufactured Automotive Exhaust Systems (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) outside of the United States for export to the United States and installation in motor vehicles manufactured and sold in the United States, and (c) outside the United States for installation in motor vehicles manufactured outside the United States for export to and sale in the United States.

38.     During the Class Period, Defendant and the Co-Conspirators sold Automotive Exhaust Systems directly to OEMs, suppliers to OEMs, distributors, and other purchasers.

39.     During the Class Period, Defendant and the Co-Conspirators, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Automotive Exhaust Systems. As a result of their unlawful conduct, Defendant and the Co-Conspirators did not compete, but instead conducted their business insulated from competition.

**THE CHARACTERISTICS OF THE MARKET FOR AUTOMOTIVE EXHAUST SYSTEMS ARE CONDUCIVE TO COLLUSION**

40.     Several important economic characteristics of the market for Automotive Exhaust Systems render it plausible that there was collusion among Automotive Exhaust Systems suppliers.

10

REDACTED

*Market Concentration*

41.     The market for Automotive Exhaust Systems is highly concentrated. As of 2013 just five companies—including Defendant and the Co-Conspirators—controlled about 75% of the global market for Automotive Exhaust Systems.

*High Barriers to Entry*

42.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing. New entrants would, in turn, decrease the market power of the conspirators and diminish their ability to successfully maintain supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Therefore, high barriers to entry help facilitate a cartel.

43.     There are high barriers to entry in the market for Automotive Exhaust Systems. Entry requires a company to incur significant start-up capital expenditures. A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor. A new entrant would also have to have assured relationships with significant customers in order to justify its substantial investments of capital.

*Price Inelasticity*

44.     When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic. In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic. Otherwise, increased prices would result in declining sales, revenues, and profits.

REDACTED

45.     Automotive Exhaust Systems are required for vehicles that use internal combustion engines; there are no viable substitute products. Therefore, pricing for Automotive Exhaust Systems is highly inelastic.

*Opportunities for Collusion*

46.     Defendant and the Co-Conspirators attended industry events that created opportunities to conspire. Such industry events have provided myriad opportunities to meet, conspire, and share information.

**DEFENDANT'S AND CO-CONSPIRATORS' ANTITRUST CONSPIRACY**

47.     During the Class Period, Defendant and the Co-Conspirators conspired to rig bids for, to allocate the supply of, and to raise, fix and maintain prices for Automotive Exhaust Systems sold in or into the United States.

48.     Defendant and the Co-Conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy.

REDACTED



56.     Defendant and the Co-Conspirators participated in these and other meetings, conversations, and communications to discuss bids and price quotations for Automotive Exhaust Systems sold in or into the United States.

57.     Defendant and the Co-Conspirators agreed during their meetings, conversations, and communications to allocate among themselves the supply of Automotive Exhaust Systems sold in or into the United States.

REDACTED

58.     Defendant and the Co-Conspirators sold Automotive Exhaust Systems to customers in the United States and elsewhere at collusive and non-competitive prices.

59.     Defendant and the Co-Conspirators accepted payments for Automotive Exhaust Systems sold in the United States and elsewhere at collusive and non-competitive prices.

60.     Defendant and the Co-Conspirators agreed during their meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

61.     Defendant and the Co-Conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

62.     Defendant and the Co-Conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

63.     Defendant and the Co-Conspirators affirmatively undertook measures to conceal their unlawful conduct.

64.     Defendant and the Co-Conspirators accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

65.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple parts suppliers; (2) the suppliers submit bids; (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (4) the suppliers submit revised bids; and (5) the OEM selects the winner.

66.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

REDACTED

67.     When OEMs purchase Automotive Exhaust Systems directly from the supplier to whom they awarded the contract, the OEMs purchase the Automotive Exhaust Systems at the winning price.

68.     That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Automotive Exhaust Systems directly from the winning bidder for incorporation into products manufactured for and sold to OEMs. Those suppliers and other direct purchasers who directly purchase Automotive Exhaust Systems from the winning bidder pay the winning bidder at least the winning price. The OEM price sets the floor for pricing of Automotive Exhaust Systems.

69.     Defendant's and the Co-Conspirators' conduct persisted for at least nine years (2002-2011). Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

70.     Among other conduct, Defendant and the Co-Conspirators manipulated the RFQ process to accomplish their conspiracy.

71.     As part of their conspiracy, at times Defendant and the Co-Conspirators agreed to submit bids that would allow the supplier that had the existing Automotive Exhaust Systems business for a particular model to win the Automotive Exhaust Systems business for the successor model.

72.     Defendant and the Co-Conspirators coordinated their Automotive Exhaust Systems pricing. They submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other. They exchanged pricing information

REDACTED

not just to ensure that the agreed-upon party would win the business, but also to ensure that the losing bidders would look competitive in order to have the opportunity to bid for future business.

73.     Defendant and the Co-Conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy. These activities included, but were not limited to, the following:

a.     Agreeing to unlawfully coordinate pricing for, and allocate sales of, Automotive Exhaust Systems. For example, in responding to RFQs, Defendant and the Co-Conspirators agreed that the incumbent supplier would be the preferred bidder, and to price their bids to affect this agreement.

b.     Colluding with regard to RFQs for Automotive Exhaust Systems business by agreeing on pricing and then communicating agreed-upon prices to their subsidiaries in the United States, where the prices were submitted collusively.

c.     Discussing and exchanging pricing information with regard to Automotive Exhaust Systems RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and exchanges and adjustments of Automotive Exhaust Systems pricing before submission to OEMs in the United States and elsewhere.

74.     Defendant and the Co-Conspirators knew and intended that their actions regarding their sales of Automotive Exhaust Systems to motor vehicle manufacturers would have a direct impact on prices for Automotive Exhaust Systems sold to all direct purchasers in the United States.

REDACTED

75.     Defendant's and the Co-Conspirators' single price-fixing conspiracy involving Automotive Exhaust Systems impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Automotive Exhaust Systems.

## ANTITRUST INVESTIGATION

76.     In March 2014 Reuters reported that European Commission antitrust regulators had raided Tenneco, Faurecia, and several other Automotive Exhaust Systems makers as part of its investigation into price fixing in the global automotive parts industry.

77.     Bloomberg reported in March 2014 that Tenneco, Faurecia, and Eberspacher Group had been "raided by European Union antitrust regulators investigating possible collusion between manufacturers of car-exhaust systems."

78.     Reuters and Bloomberg also reported that Tenneco had received a related subpoena from the U.S. Department of Justice.

79.     Tenneco, Faurecia, and Eberspacher each acknowledged that they were under investigation.

80.     The European Commission announced its actions in a press release dated March 25, 2014, triggering public comment by the parties under investigation.

81.     That same day Tenneco released a statement in which it "confirmed . . . that authorities in Europe and the United States have requested information as part of an ongoing global antitrust investigation concerning multiple automotive suppliers," and acknowledged that "[r]epresentatives of the European Commission were at Tenneco GmbH's Edenköben, Germany administrative facility to gather information in connection with the investigation."

82.     Tenneco said it was "fully cooperating with the authorities."

83.     Faurecia and Eberspacher said the same.

REDACTED

84.     In a 10-Q filing with the Securities and Exchange Commission, Tenneco reported: "Antitrust law investigations and related matters often continue for several years and can result in significant penalties and liability. At this point, we cannot estimate the ultimate impact on our company from investigations into our antitrust compliance and related matters in light of the uncertainties and many variables involved, and there can be no assurance that the ultimate resolution of these matters will not have a material adverse effect on our consolidated financial position, results of operations or liquidity."

## CLASS ACTION ALLEGATIONS

85.     Plaintiffs bring this action on behalf of themselves, and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as the representatives of a Class defined as follows:

> All direct purchasers of Automotive Exhaust Systems (excluding Defendant and Co-Conspirators, including their past and present parents, subsidiaries, affiliates and joint-ventures) in the United States from the Defendant or any of the Co-Conspirators (or their controlled subsidiaries, affiliates, or joint-ventures) between at least as early as January 1, 2002 and the date of the filing of this Complaint.
>
> For purposes of the class definition, the following entities are "Co-Conspirators": Bosal Nederland, B.V.; Bosal Industries-Georgia, Inc. (a/k/a Bosal International North America); Bosal USA, Inc.; Friedrich Boysen GmbH & Co. KG; Eberspacher Exhaust Technology GmbH & Co. KG; Eberspacher North America, Inc.; Faurecia SA; Faurecia Emissions Control Technologies, USA, LLC; and Faurecia Exhaust Systems, Inc.; Meritor, Inc. (f/k/a ArvinMeritor); and Tenneco, Inc., Tenneco Automotive Operating Co., Inc., and Tenneco GmbH.
>
> The class definition is not the same as in the settlement agreement.

86.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of Class members is unknown to Plaintiffs, it is believed to be in the hundreds. The identity of the members of the

REDACTED

Class can be readily determined from information and records Defendant and the Co-Conspirators possess.

87.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Defendant and the Co-Conspirators, *i.e.*, they have paid artificially inflated prices for Automotive Exhaust Systems as a result of Defendant's and the Co-Conspirators' anticompetitive and unlawful conduct.

88.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

89.     Plaintiffs are represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

90.     Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members, because Defendant and the Co-Conspirators have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendant's and the Co-Conspirators' anticompetitive and unlawful conduct.

91.     There are core questions of law and fact common to the Class, such as:

a.     Whether Defendant and the Co-Conspirators conspired to fix, raise, maintain, or stabilize prices of, to allocate, or to rig bids for, Automotive Exhaust Systems;

b.     Who participated in the conspiracy and how long it lasted;

c.     Whether the conspiracy caused Automotive Exhaust Systems prices to be higher than they otherwise would have been;

19

REDACTED

d.      Whether Defendant's and the Co-Conspirators' conduct caused injury to the business or property of Plaintiffs and members of the Class;

e.      Whether Defendant's and the Co-Conspirators' conduct violated Section 1 of the Sherman Act;

f.      Whether Defendant and the Co-Conspirators undertook actions to conceal their unlawful conspiracy; and

g.      How to measure the damages suffered by the Class.

92.      A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly increase the cost and duration of litigation for all parties and for the judicial system. A class action permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

**ANTITRUST INJURY SUFFERED BY PLAINTIFFS AND THE CLASS**

93.      Defendant's and the Co-Conspirators' anticompetitive conduct has had the following effects:

a.      price competition has been restrained, suppressed, or eliminated with respect to Automotive Exhaust Systems;

b.      the prices of Automotive Exhaust Systems have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.      purchasers have been deprived of free and open competition in the Automotive Exhaust Systems market.

REDACTED

94.     As a result of Defendant's and the Co-Conspirators' contract, combination, or conspiracy, Plaintiffs and other Class members paid higher prices for Automotive Exhaust Systems than they would have in the absence of the conspiracy, and Plaintiffs and other Class members have sustained injury to their business or property.

## PLAINTIFFS' CLAIMS ARE TIMELY

95.     Plaintiffs and other Class members had no knowledge of the anticompetitive conduct alleged herein by Defendant until a date less than four years before the filing of this Complaint.

96.     Plaintiffs and other Class members did not discover and could not have discovered through the exercise of reasonable diligence, the Defendant's involvement in the conspiracy alleged herein before that date.

97.     No information about the Defendant's involvement in the Automotive Exhaust Systems conspiracy has ever been in the public domain or otherwise available to Plaintiffs or the Class prior to less than four years before the filing of this Complaint. Until then there was no or insufficient information to suggest that Defendant and the Co-Conspirators were involved in an Automotive Exhaust Systems conspiracy. For these reasons, the statute of limitations as to Plaintiffs' and the Class's claims did not begin to run until (at the earliest) less than four years before the filing of this Complaint.

98.     Fraudulent concealment by Defendant also tolled the statute of limitations on the claims asserted by Plaintiffs and the Class until at least four years before the date this Complaint was filed. Defendant affirmatively and wrongfully concealed its anticompetitive conduct from Plaintiffs and the Class, from at least less than four years before the filing of this Complaint.

REDACTED

During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to this Complaint.

99.     Before at least four years before the filing of this Complaint, Plaintiffs and the Class were unaware of Defendant's unlawful conduct, and did not know before then that they were paying supra-competitive prices for Automotive Exhaust Systems during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs or other members of the Class that would have suggested that they were being injured by Defendant's unlawful conduct.

100.     The affirmative acts by the Defendant alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

101.     By its very nature, Defendant's anti-competitive conspiracy was inherently self-concealing. Because Automotive Exhaust Systems are not exempt from antitrust regulation, Plaintiffs and the Class reasonably believed that the market for Automotive Exhaust Systems was competitive.

102.     Defendant and the Co-Conspirators represented publicly that their pricing and bidding activities were unilateral, rather than being based on anticompetitive agreements. In making those false representations, Defendant and the Co-Conspirators misled Plaintiffs and the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer-allocation, and price-fixing activities.

103.     Defendant's wrongful conduct was carried out in part through means and methods that were designed to prevent detection, and which for a long time succeeded in preventing detection.

REDACTED

104.    In particular, Defendant and the Co-Conspirators participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

105.    During these meetings, conversations, and communications, Defendant and the Co-Conspirators agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

106.    Defendant and the Co-Conspirators likewise agreed to allocate the supply of Automotive Exhaust Systems sold to customers in the United States and elsewhere on a model-by-model basis.

107.    Defendant and the Co-Conspirators also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

108.    In accordance with their agreements, Defendant and the Co-Conspirators submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

109.    Plaintiffs and the Class could not have discovered the Defendant's involvement in the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendant to avoid detection of, and to fraudulently conceal, its conduct.

110.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Class's claims was tolled and did not begin to run until at least four years before the filing of this Complaint.

REDACTED

## COUNT I: CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

111.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth here.

112.   Defendant and the Co-Conspirators entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

113.   The acts done by Defendant and each of the Co-Conspirators as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendant's and the Co-Conspirators' affairs.

114.   Commencing at least as early as January 1, 2002 and continuing until the present, the exact dates being currently unknown to Plaintiffs, Defendant and the Co-Conspirators entered into a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Automotive Exhaust Systems, creating anticompetitive effects.

115.   Defendant's and the Co-Conspirators' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Exhaust Systems throughout the United States.

116.   As a result of the conspiracy alleged herein, the prices charged to Plaintiffs and the other members of the Class for Automotive Exhaust Systems were unlawfully raised, fixed, maintained, or stabilized in the United States.

REDACTED

117.   The conspiracy has had the following effects:

a.      prices paid by Plaintiffs and the Class for Automotive Exhaust Systems were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.      Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Automotive Exhaust Systems; and

c.      competition in the market for Automotive Exhaust Systems has been unlawfully restrained, suppressed, or eliminated.

118.   As a direct and proximate result of Defendant's and the Co-Conspirators' unlawful conduct, Plaintiffs and the Class have been damaged, and will continue to be damaged, by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendant and the Co-Conspirators as alleged herein.

119.   The conspiracy is a *per se* violation of the federal antitrust laws.

REDACTED

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully request the following relief:

A.      That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendant and the Co-Conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That Plaintiffs and the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendant in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.      That Defendant, its subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on its behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiffs and the Class receive such other or further relief as may be just and proper.

REDACTED

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: November 26, 2018    /s/ David H. Fink
              David H. Fink (P28235)
              Darryl Bressack (P67820)
              Nathan J. Fink (P75185)
              FINK + ASSOCIATES LAW
              38500 Woodward Avenue
              Suite 350
              Bloomfield Hills, MI 48304
              Telephone: (248) 971-2500
              dfink@finkandassociateslaw.com
              dbressack@finkandassociateslaw.com
              nfink@finkandassociateslaw.com

              Gregory P. Hansel
              Randall B. Weill
              Michael S. Smith
              PRETI, FLAHERTY, BELIVEAU
               & PACHIOS LLP
              One City Center
              P.O. Box 9546
              Portland, ME 04112-9546
              Telephone: (207) 791-3000
              ghansel@preti.com
              rweill@preti.com
              msmith@preti.com

              Joseph C. Kohn
              William E. Hoese
              Douglas A. Abrahams
              Craig W. Hillwig
              KOHN, SWIFT & GRAF, P.C.
              1600 Market Street, Suite 2500
              Philadelphia, PA 19103
              Telephone: (215) 238-1700
              jkohn@kohnswift.com
              whoese@kohnswift.com
              dabrahams@kohnswift.com
              chillwig@kohnswift.com

REDACTED

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN & KODROFF,
 P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Carl E. Person
225 E. 36th Street – Suite 3A
New York, N.Y. 10016-3664
Telephone: (212) 307- 4444
carlpers2@gmail.com

Irwin B. Levin
Scott Gilchrist
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com
sgilchrist@cohenandmalad.com

*Counsel for Plaintiffs Manny's Auto Supply, Inc.,
Irving Levine Automotive Distributors, Inc. and
the Proposed Class*